UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GLEISTON PORCINODE ANDRADE,

Petitioner,

v.

DEAN BORDERS,

Respondent.

Case No. 17-cv-04331-VC  (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Gleiston Porcinode Andrade filed a *pro se* petition for a writ of habeas corpus challenging the validity of his state criminal conviction.  The petition and a certificate of appealability are denied.

## PROCEDURAL BACKGROUND

On February 6, 2012, a jury found Andrade guilty of six counts of forcible oral copulation and seven counts of forcible rape.  2 Clerk's Transcript ("CT") 514-21; 523-27; ECF No. 21-3 at 524-31; 533-37.  The jury found true the allegation that Andrade committed the offenses against multiple victims.  *Id.*  The trial court sentenced Andrade to 15 years to life with the possibility of parole for each count, for a total of 195 years to life with the possibility of parole.  *Id.* at 608, 610.

Andrade appealed and, on July 24, 2015, the California Court of Appeal, in a published opinion, ordered a correction of a clerical error in the abstract of judgment but otherwise affirmed the judgment.  *People v. Andrade*, 238 Cal. App. 4th 1274, 1311 (2015).  On October 14, 2015, the California Supreme Court denied a petition for review.  Ex. 10.

## BACKGROUND

The California Court of Appeal summarized the evidence presented at trial as follows:

**A. Rape of Jane Doe I**

On April 17, 2009, 20-year-old Jane Doe I had been visiting with her sister at a friend's house in Oakland. When it was time for Jane Doe I's sister to go back home to Sacramento, she dropped Jane Doe I off near the Fruitvale Bay Area Rapid Transit (BART) station. Jane Doe I admitted that she had done some prostituting, but testified that she was not working that night. As Jane Doe I was walking to the station, she saw a black two-door Mercedes drive by in the opposite direction. The car parked, and a man, later identified as appellant, got out and began walking behind her. Appellant soon caught up with her, grabbed her arm, and put a gun in her back. He told Jane Doe I not to say anything, pulled her back to the Mercedes, and put her in the passenger seat. Once in the car, appellant pointed the gun at Jane Doe I's leg. Then he started to drive, stopping at two places, but moving on again, apparently uncomfortable with the amount of lighting in those areas. At some point, Jane Doe I asked appellant why he was doing this, and appellant struck her in the face. Eventually, after crossing High Street, he turned onto Tidewater Street and stopped in an industrial area. He demanded that Jane Doe I perform oral sex on him. He used a condom. Eventually, he said that was enough, climbed over to the passenger side, pulled off Jane Doe I's shorts and underwear, and began having vaginal intercourse with her. At one point, he said he could not feel anything, so he took off the condom, and then put his penis back in Jane Doe I's vagina. Appellant ejaculated into a napkin, which he threw out the window, along with the condom.

Appellant then drove the car to an alley. Appellant told Jane Doe I that he used to work for the Oakland Police Department, and that he would find her if she told anyone. He told her to get out of the car. Jane Doe I began walking towards the BART station in a daze. Some passersby came to her aid and drove her to Highland Hospital, where she was examined.

Lauri Paolinetti, a physician's assistant at Highland Hospital, testified as an expert in sexual assault examinations. She performed a sexual assault exam on Jane Doe I around 2:25 a.m. on April 18. Jane Doe I complained of mouth pain, and she had bruising and tenderness on her arms. There was also an abrasion to her right upper lip and bruising on her neck. Paolinetti noticed an injury to Jane Doe I's posterior fourchette, which she explained was the most commonly injured area in sexual assault cases.[1] Paolinetti collected oral, vaginal, and rectal swabs from Jane Doe I, as well as the clothing she was wearing.

---

[1] The vulva is the outer part of the female reproductive system; the fourchette is at the bottom of the inner folds of the vulva. Health Encyclopedia, University of Rochester Medical Center, Anatomy of the Vulva
https://www.urmc.rochester.edu/encyclopedia/content.aspx?contenttypeid=34&contentid=19522-1 (last visited March 26, 2019).

Oakland Police Department Officer Michael Stolzman took Jane Doe I's statement at the hospital. Afterwards, he used her description to find the location he believed was the scene of her rape, which was a "very industrial street with just commercial buildings; no retail shops." However, he was unable to locate any evidence there.

Investigators showed Jane Doe I photo lineups on three occasions. In the first two lineups, which occurred April 29 and 30, Jane Doe I did not recognize any suspects. In the third lineup, which Jane Doe I saw on October 28, she identified appellant as the man who raped her.

## B. Rape of Jane Doe II

On the evening of April 19, 2009, 16-year old Jane Doe II was working as a prostitute near 46th Avenue and International Boulevard in Oakland. She saw a "bluish . . . Toyota or [ ] Chevrolet" truck pull up. Jane Doe II got in and noticed that the interior was leather, with bench-style seating in the front. She asked the driver, later identified as appellant, whether he was an undercover officer, and appellant responded that he was not. Jane Doe II did not have a condom with her and asked to get one. Appellant drove her to a liquor store, where Jane Doe II purchased a condom.

Appellant then drove Jane Doe II down High Street, saying he knew of a "little place" where they could park that was "comfortable." He drove through a place with "nothing but a bunch of trucks and then just trees and dirt," eventually stopping in an isolated area Jane Doe II asked for the money. Appellant reached underneath his seat and pulled out a black gun, then pointed it at Jane Doe II's head. Jane Doe II panicked but could not open her door. Appellant told her to take her clothes off. He demanded that Jane Doe II perform oral sex on him, and Jane Doe II complied. Appellant was wearing a condom. Appellant then got on top of her and had vaginal intercourse with her. Eventually, he took the condom off and told her he had not finished. He placed his penis in Jane Doe II's mouth, then her vagina, then her mouth again, where he ejaculated. He threw the condom out the window.

As appellant began to drive Jane Doe II back to where he had picked her up, he said, "I do this to a lot of the girls. . . . I take them back there." When Jane Doe II got out of the truck, appellant told her, "No matter who you run to or tell, I don't exist." Jane Doe II went to a gas station, where a lady let her use her phone and drove Jane Doe II home. Later, Jane Doe II went to the hospital.

Denae Reed, a physician's assistant at Highland Hospital, performed a sexual assault exam on Jane Doe II. Reed testified as an expert on such exams. Using a special dye, Reed opined that Jane Doe II had sustained a minor injury to her posterior fourchette. Reed collected swabs and Jane Doe II's clothing.

Oakland Police Department Officer David Mathison took Jane Doe

II's statement. He went to the location that Jane Doe II had described, which was the 4300 block of Tidewater Street. He was unable to locate a condom. Later, Jane Doe II was shown four photo lineups. She did not identify anyone in the first two. In the third, she identified an individual who looked similar to her rapist, but she said that it was not him. In the fourth lineup on October 30, 2009, she identified a picture of appellant as her rapist. She cried and shook as she made the identification.

## C. Rape of Jane Doe III

On July 6, 2009, 25-year-old Jane Doe III was in Oakland hanging out with her friends. Later that evening, while she was alone and waiting for a ride on a side street near International Boulevard, she saw a small, light-colored, two-door car, possibly a Honda or Toyota pull up nearby. The driver and sole occupant of the car, later identified as appellant, asked if Jane Doe III "ha[d] anything." Jane Doe III believed he was asking for drugs. Jane Doe III was carrying about $10 worth of crack cocaine. As she and appellant were talking, they saw some police officers pass nearby. Appellant told her to get in the car, and Jane Doe III complied.

Once Jane Doe III was inside the car, she agreed to sell appellant crack cocaine, and she asked to see the money. Appellant reached towards the driver's side door and drew a black gun, which he pointed at Jane Doe III's stomach. Scared, Jane Doe III threw the drugs on his lap. Appellant told her to look forward and he began driving. During the drive, he told Jane Doe III he was a police officer. At one point, he spoke into a walkie-talkie. He showed Jane Doe III a silver badge. Jane Doe III noticed a FasTrak device in the middle of the front windshield.

Appellant parked the car in an industrial area near High Street. He told Jane Doe III to pull her pants down, and he threatened to kill her if she did not cooperate. Jane Doe III complied, and appellant pulled his own pants down. Appellant was wearing a condom and demanded that she perform oral sex on him. Jane Doe III was crying so hard that she was unable to do as she was commanded. Appellant then told Jane Doe III to get on her hands and knees; he got behind her in the passenger seat, and began having vaginal intercourse with her. When appellant was finished, he told Jane Doe III to put her clothes on and he threw the condom out the door.

Appellant drove Jane Doe III a short distance, then made a U-turn and stopped the car. He told her to get out and run the opposite direction that the car was facing. He had taken Jane Doe III's phone from her at some point, and returned it after wiping off his fingerprints with his shirt. Jane Doe III ran to a nearby McDonalds, where someone let her use their phone to call her friend, as Jane Doe III's cell phone battery had gone dead. Jane Doe III did not call 911 because she believed appellant was a police officer. Jane Doe III's friend picked her up and drove her to a family member's house in Richmond. Later that night, she went

to the hospital.

Martin Moran, a physician's assistant at Highland Hospital, testified as an expert in sexual assault examinations. He performed a sexual assault exam on Jane Doe III on July 7, around 3:45 a.m. Jane Doe III complained of vaginal pain, and Moran noticed an injury to her posterior fourchette, which he said was the most commonly injured area in sexual assault cases.

Oakland Police Department Officer Dometrius Fowler took Jane Doe III's statement at the hospital. Afterwards, he used Jane Doe III's description to find a location that he believed was the scene of her rape. However, he was unable to locate any evidence at that location.

Jane Doe III was shown two photo lineups. In the first, she did not recognize anyone. In the second, she became visibly upset, started crying, and identified appellant as the man who had raped her.

## D. Rape of Jane Doe IV[ FN2]

[FN2] Jane Doe IV's preliminary hearing testimony was read to the jury

On September 11, 2009, 15-year-old Jane Doe IV was working as a prostitute near 19th Avenue and International Boulevard, when she saw a "tannish" Toyota Corolla pull up. Jane Doe IV had met the driver, later identified as appellant, a year earlier, when he claimed to be an undercover officer and did not pay her. Jane Doe IV and appellant agreed on a deal for "[a] blow job and sex."

Jane Doe IV got into the car and appellant drove to an alley off of "East 23rd." There, he pulled out a gun, pointed it at Jane Doe IV's chest, and told her to pull her pants down. He told her that as long as she did what he wanted, he would not hurt her. Jane Doe IV put a condom on appellant and performed oral sex while crying. Eventually, appellant climbed on top of Jane Doe IV and began having vaginal intercourse with her. When he was finished, he sat back in the driver's seat and took the condom off. Appellant said he was an undercover police officer. He told Jane Doe IV that he would drive her back, but if he caught her again, he would take her to jail. Jane Doe IV got out and went home. About a month later, she reported the rape and gave a statement to the police.

Some time after making her report, Jane Doe IV saw appellant again. He was driving a blue Chevrolet pickup truck near 17th Avenue and International Boulevard. Jane Doe IV called the officer who had taken her statement and told him about the sighting. Later, she identified appellant out of a photo lineup as "the guy that raped me, and pretended to be a police officer."

## E .Rape of Jane Doe V
In the early morning of September 12, 2009, 22-year-old Jane Doe

V was working as a prostitute near 21st Avenue and International Boulevard, when she saw a small, light-colored car, possibly a Honda approach. Jane Doe V recognized the driver, later identified as appellant, as a man she had unsuccessfully negotiated with on a prior occasion. Jane Doe V got in the car and agreed to perform sexual acts for money. They drove off to find a suitable location, eventually stopping near a garage.

Appellant then reached over and locked Jane Doe V's door. He pulled a gun from the driver's side door and pointed it at Jane Doe V's head. Jane Doe V was frightened and crying, but appellant told her that he would not do anything to her if she cooperated. Jane Doe V put a condom on appellant and performed oral sex on him. Eventually, appellant stopped her, climbed into her seat, and began having vaginal intercourse with her. After approximately 10 minutes, appellant got off of Jane Doe V. He threw the condom out the window. He told Jane Doe V to get out and walk away; he backed the car away.

Jane Doe V called 911 and reported her rape. She then stayed at the scene until police arrived, and she directed them to the condom on the ground. Jane Doe V then went to Highland Hospital, where she submitted to a sexual assault exam. Saloni Patel, a physician assistant at Highland Hospital, testified as an expert in sexual assault exams. Although she did not observe any injuries, she explained that this was "very common."

When shown a photo lineup, Jane Doe V immediately pointed to appellant's picture and identified him as her rapist.

## F. Police Investigation

Around 8:50 p.m. on October 26, 2009, Emeryville Police Department Officer Edward Mayorga responded to 6701 Shellmound Street in Emeryville. There, he saw another officer's car parked behind a blue Chevy pickup truck. Officer Mayorga ordered the driver out of the car and placed him in his patrol car. The driver was identified as appellant. Underneath the driver's seat of the truck, Officer Mayorga saw what looked like a semi-automatic, black and silver pistol. The weapon was actually a BB gun.

Oakland Police Department Officer Carlos Gonzalez had been investigating Jane Doe III's, Jane Doe IV's, and Jane Doe V's cases, and assisting with the other similar cases. When he learned of the circumstances of appellant's arrest, he instructed other officers to distribute a new photo lineup, including appellant's picture, to the victims.

On October 27, Officer Gonzalez supervised the execution of a search warrant at appellant's home. There, officers found a small Toyota Corolla parked in front of the home, with a FasTrak device on the front windshield. Inside the car was a Mercedes Benz vehicle manual and a service receipt listing a Mercedes license plate.

On October 29, Officer Gonzalez went to the Santa Rita Jail and obtained an oral swab from appellant.

Chani Sentiwany, a criminalist with the Oakland Police Department, testified as an expert "in the examination of biological evidence, DNA typing and DNA analysis." She examined the sexual assault exam kits obtained from Jane Doe III, Jane Doe I, Jane Doe V, and Jane Doe II. She was unable to identify sperm on any of the samples from Jane Doe III's kit. She was able to find sperm in Jane Doe I's kit, but the DNA profile she extracted matched Jane Doe I's consensual sexual partner. She also found sperm on Jane Doe V's underwear, but was unable to extract a DNA profile from the minimal sample. Sentiwany also found sperm on Jane Doe II's oral swabs, and appellant's DNA was a one-in-89-billion match. Finally, Sentiwany examined the condom recovered from Jane Doe V's rape, and appellant's DNA was a one-in-96-sextillion match.

Mona Madaio was an investigator with the Department of Motor Vehicles (DMV). Oakland Police Department Officer Bryant Ocampo had asked the DMV to investigate the Mercedes information recovered from appellant's Corolla. Madaio testified that appellant had legal possession of a 2003 Mercedes sport coupe from June 20, 2007, until June 1, 2009.

*Andrade*, 238 Cal. App. 4th at 1281-87.

## LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This is a highly deferential standard for evaluating state court rulings: "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond

any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

AEDPA requires a district court to presume correct any determination of a factual issue made by

a state court unless the petitioner rebuts the presumption of correctness by clear and convincing

evidence. 28 U.S.C. § 2254(e)(1). Additionally, habeas relief is warranted only if the

constitutional error at issue "'had substantial and injurious effect or influence in determining the

jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*,

507 U.S. 619, 637 (1993)).

When there is no reasoned opinion from the highest state court to consider the

petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze

whether the state judgment was erroneous under the standard of § 2254(d*). Ylst v. Nunnemaker*,

501 U.S. 797, 801-06 (1991). In this case, the California Court of Appeal is the highest court to

issue a reasoned decision on Andrade's claims.

## DISCUSSION
### I. Exclusion of Evidence of Unsolved Cases

#### A. Background

Andrade argues the trial court violated his right to present a defense by excluding

evidence of similar unsolved rape cases and by limiting cross-examination of witnesses on this

topic. The Court of Appeal summarized the facts relevant to this claim as follows:

> Prior to trial, the prosecution moved to exclude evidence of third
> party culpability absent an offer of proof. The trial court granted
> the motion. During trial, the prosecution elicited information from
> police witnesses about other suspects who were ultimately
> excluded after further investigation. The defense was permitted to
> cross-examine these witnesses regarding those eliminated suspects.
> The defense, however, was not permitted to cross-examine the
> witnesses about the possibility of other "police poser rape cases."

> During the prosecution's case, the defense requested permission to
> cross-examine Officer Gonzalez "with reference to some other
> police reports . . . in an effort to establish third party culpability."
> Defense counsel had the reports, but had not yet reviewed them to
> determine if she would raise the issue on cross-examination.
> Without ruling on the issue, the court noted that "there must be
> some direct or circumstantial evidence connecting a third person to

the actual perpetration of the crime . . . [Case law] suggests that that must be a known person.  In other words, you can't for instance, show that other people might have had the same motive."

After the close of evidence, the defense placed on the record that the court had ruled in chambers that the defense could not cross-examine police witnesses about two particular police reports.  The court responded with its reasoning for the ruling, explaining that "since there was no evidence that there was a known suspect [in those cases], . . . cross-examination on the matter would not be relevant."

The defense reasserted the issue in its motion for a new trial.  In its motion, the defense identified four police reports describing rapes under circumstances similar to those of the victims in appellant's case.  Each case involved an African–American female prostitute picked up on or near International Boulevard, threatened with a firearm, and raped.  In some cases, the assailant would claim involvement with law enforcement, force the victim to orally copulate him, or take the victim to an area near High Street and Tidewater Street.  In each case, the description of the assailant and his vehicle was similar to that of appellant and one of his vehicles.  In each case, the victim did not identify appellant as the attacker.  In one case, recovered DNA evidence did not match appellant.

The trial court denied the new trial motion, explaining that the challenged cross-examination would have been hearsay to the extent the defense would have tried to introduce evidence that those victims had not identified appellant, or that DNA evidence cleared him in one of the cases.  The court also noted "there is no link to a known suspect."  Finally, the trial court explained that allowing the cross-examination may have opened the door to the prosecution presenting additional evidence on those cases, taking "substantial additional time."

*Andrade*, 238 Cal. App. 4th at 1287-88.

The Court of Appeal denied this claim, concluding that the excluded evidence did not "establish a link between a third person and the crimes charged against appellant," as required by state law.  It denied Andrade's constitutional claim on the ground that "application of the ordinary rules of evidence under state law does not violate a criminal defendant's federal constitutional right to present a defense, because trial courts retain the intrinsic power under state law to exercise discretion to control the admission of evidence at trial."  *Id.* at 1289-90.

**B. Federal Authority**

Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fifth or Fourteenth Amendment guarantee of due process, "The Constitution

guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). The right to present a complete defense necessarily includes a right to present evidence in support of one's defense, but this right is not absolute. *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). "State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see also Montana v. Egelhoff*, 518 U.S. 37, 53 (1996) ("The introduction of relevant evidence can be limited by the State for a valid reason.").

The constitutional right to present a complete defense is implicated only when the evidence the defendant seeks to admit is "relevant and material, and . . . vital to the defense." *Washington v. Texas*, 338 U.S. 14, 16 (1967); *Holmes*, 547 U.S. at 324 (violation of right to present a defense does not occur any time evidence is excluded, but rather only when its exclusion is "arbitrary or disproportionate to the purposes [the exclusionary rule applied is] designed to serve.").

The Supreme Court has addressed challenges to state evidentiary rules that impinge upon the right to present a defense; however, the Court has not addressed a challenge to the trial court's exercise of discretion to exclude certain testimony. *Moses v. Payne*, 555 F.3d 742, 758 (9th Cir. 2009) (because Supreme Court has not clearly established a "controlling legal standard" for evaluating discretionary decisions to exclude [the kind of evidence at issue], state court's denial of claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent).

 "Only rarely" has the Supreme Court held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence. *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (citing *Holmes*, 547 U.S. at 331). A violation of the right to present a defense merits habeas relief only if the error was likely to have had a substantial and injurious effect on the verdict. *Lunbery v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010).

These principles apply to third-party culpability evidence. *Holmes*, 547 U.S. at 327 (noting the wide acceptance of rule that third-party culpability evidence "may be excluded where

it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial.")

**C. Analysis**

To the extent that Andrade's claim is based on a violation of state law, it is denied because habeas relief is only available for violations of the Constitution, laws, or treaties of the United States. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991). To the extent that Andrade is challenging the California rule of evidence that allows the admission of third-party culpability evidence only if it links the third person either directly or circumstantially to the perpetration of the crime, it is denied because this evidentiary rule is widely accepted. *See Holmes*, 547 U.S. at 327.

Because the United States Supreme Court has never held that a trial court's exercise of its discretion to exclude evidence, under a constitutionally sound evidentiary rule, violated a defendants' constitutional right to present evidence, the state court's decision cannot be contrary to or an unreasonable application of established Supreme Court authority. *See Moses*, 555 F.3d at 758-59; *see also Mendez v. Biter*, 2013 WL 843554, *15 (N.D. Cal. Mar. 6, 2013) (because Supreme Court has not squarely addressed whether trial court's exercise of discretion to exclude evidence violated right to present a defense, habeas relief unavailable). Based on this authority, this claim is not entitled to habeas relief.

Even when considering the merits of this claim, it cannot be said that the state court's decision was contrary to or an unreasonable application of established Supreme Court authority. The prosecution gave the defense police reports from 11 open rape cases. Reporter's Transcript ("RT") 1103, 1157-58; ECF No. 21-5 at 520, 574-75. In its motion for a new trial based upon third-party exculpatory evidence, the defense discussed four of these cases. 2 Court Transcript ("CT") 600; ECF No. 21-3 at 610 (describing several open cases where circumstances of the attack, description of the suspect and the vehicle driven were similar to Andrade's charged offenses). However, even Andrade's trial and appellate counsel acknowledged that the modus

operandi described in the open cases was not unique in that picking up prostitutes on the street in Oakland known for prostitution, raping them and claiming a connection to law enforcement is so common in Oakland that the Oakland Police Department has a nine-page document entitled "Rapists Posing as Law Enforcement." *See* ECF No. 21-3 at 610 (new trial motion); Ex. 5 at 25; ECF No. 21-6 at 184 (appeal brief). Defense and appellate counsel argued that the similarities between all the cases meant they would raise a reasonable doubt in the mind of the jury in that a third party could have been responsible for all the rapes. On the other hand, the similarities do not show a particular third person committed all the rapes, including those charged to Andrade, because the circumstances were common to many rape cases.

Furthermore, there was overwhelming evidence of Andrade's guilt. Most incriminating were the five victims' independent identifications of Andrade as the person who raped them. All of the victims interacted with Andrade in a close, confined space for a substantial period of time, so all of them had a good, extended look at his face. Two of the victims recognized Andrade from previous interactions they had with him. All of Andrade's cars matched the victims' descriptions of the cars driven by their rapists. In one of Andrade's cars, the police found a BB gun under the seat that looked like a semi-automatic pistol that the victims said the rapist pointed at them. Finally, Andrade's DNA was found in one of the victim's oral swab and in a condom he used to rape another victim. Given the prosecutor's case against Andrade, the exclusion of the evidence of unsolved rapes did not have a substantial and injurious effect or influence on the jury's verdict.

## II. Victim's Preliminary Hearing Testimony Read to Jury

### A. Background

Andrade argues the admission of Jane Doe IV's preliminary hearing testimony violated his rights to due process and to confront witnesses. The Court of Appeal summarized the facts relevant to this claim as follows:

> Jane Doe IV was not available at the time of trial, although she had testified at appellant's preliminary hearing on February 23, 2010. The trial court conducted a hearing on the prosecution's efforts to

procure Jane Doe IV's appearance at trial. The prosecution presented the testimony of two witnesses detailing the efforts to locate Jane Doe IV.

Inspector Stephanie England testified that prior to the preliminary hearing, she had spoken with Jane Doe IV by calling the phone number provided on the police report. In December 2009, she met with Jane Doe IV in Oakland at Jane Doe IV's boyfriend's sister's house. England had the phone numbers for Jane Doe IV, Jane Doe IV's boyfriend, and Jane Doe IV's grandmother's boyfriend. Jane Doe IV testified at appellant's preliminary hearing without issue.

However, after the preliminary hearing, Jane Doe IV's phone number was no longer in service. Jane Doe IV, a juvenile at the time, had no reliable, known address. England ran Jane Doe IV's criminal history, checked for a California driver's license or identification card, and called all of the phone numbers she had, all to no avail. England was unable to find addresses for Jane Doe IV's parents, grandparents, or boyfriend. In August 2011, she handed the case off to another investigator, Inspector Lux, who had requested police reports from the El Cerrito Police Department related to Jane Doe IV's grandmother and the grandmother's boyfriend.

In November 2011, Inspector Harry Hu took over for Inspector Lux. Hu left a message at the phone number given for Jane Doe IV's grandmother's boyfriend in the El Cerrito police reports, but received no response. Hu checked local, state, and federal law enforcement databases for Jane Doe IV, but found nothing. He also looked for information on Jane Doe IV's family in those databases, but again found nothing. He tried calling all of the phone numbers related to Jane Doe IV, but they were either disconnected or not receiving calls. He sent messages to Jane Doe IV on the Facebook and Myspace Web sites, but did not receive an answer. On Jane Doe IV's Facebook account, she listed "Ray [H.]" as her husband. Hu tracked down an address for two men named "Ray [H.]" (father and son) in Richmond. He went there and spoke to them, but they did not know Jane Doe IV. He checked whether Jane Doe IV had received a driver's license or identification card, owned a car, or had an adult criminal history, all without result. He ran her name through a "people-search database" without result. When he ran her family's names through the database, he obtained phone numbers, but they were either disconnected or did not answer. Hu also checked whether Jane Doe IV was in a local hospital, but found nothing. He had run checks on Jane Doe IV's given name, Jane Doe IV with her mother's last name, and Jane Doe IV with Hale's last name, and found nothing. Hu had tried all of the contact information again on the day of hearing.

Hu acknowledged that he had an address for Jane Doe IV's grandmother but had not gone there. He also had Jane Doe IV's mother's last known address in San Francisco, but had not gone there either.

> Defense counsel argued that the prosecution had not shown due
> diligence in attempting to bring Jane Doe IV to court. Defense
> counsel also argued that counsel did not have the same opportunity
> or motive to cross-examine Jane Doe IV at the preliminary
> hearing, since the purpose of the preliminary hearing was simply to
> show probable cause, and the defense attorney at that hearing had
> not previously met with appellant. The trial court disagreed and
> found that the prosecution had exercised due diligence and that the
> defense had a sufficiently similar motive and opportunity to cross-
> examine Jane Doe IV at the preliminary hearing.

*Andrade*, 238 Cal. App. 4th at 1291-92.

The Court of Appeal held Andrade's rights were not violated when Jane Doe IV's preliminary hearing testimony was read to the jury because the prosecution had exercised reasonable diligence in attempting to find her and defense counsel had an opportunity to cross-examine her at the preliminary hearing. *Id.* at 1294-95.

### B. Analysis

The Confrontation Clause applies to all out-of-court testimonial statements offered for the truth of the matter asserted, i.e., "testimonial hearsay." *Crawford v. Washington*, 541 U.S. 36, 51 (2004). Out-of-court statements by witnesses that are testimonial hearsay are barred under the Confrontation Clause unless (1) the witnesses are unavailable, and (2) the defendants had a prior opportunity to cross-examine the witnesses. *Id.* at 59. The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *Id.* at 61. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. *Id.*

The prosecutor must make a good faith effort to obtain the witness's presence at a trial for cross-examination. *Barber v. Page*, 390 U.S. 719, 724-25 (1968); *see, e.g., Hardy v. Cross*, 565 U.S. 65, 70-72, *rehearing denied*, 565 U.S. 1230 (2012) (state court reasonably concluded that prosecution had made reasonable effort to procure attendance of witness when repeated visits were made to her last known address, relatives were questioned, and records were consulted). There may be additional steps the prosecutor could have taken to find a witness, but, in hindsight, one may always think of other things and the constitution does not require the

prosecution to exhaust every avenue of inquiry. *Id.* at 70, 72. On habeas review, a federal court must to defer to a state court's decision on the question of unavailability. *Id.* at 72.

Jane Doe IV was a juvenile with no known address and a cell phone that was no longer in service. The prosecutor assigned various investigators to find her. In the months leading up to the trial, the investigators called all her known phone numbers and those of her family members and close friends; they checked various databases, reached out on social media, checked at a local hospital and visited a man she listed as her husband on social media. Given the prosecutor's effort to find Jane Doe IV, the Court of Appeal's rejection of this claim was not contrary to or an unreasonable application of Supreme Court authority.

Furthermore, the state court was not unreasonable in rejecting Andrade's argument that his counsel did not have an adequate opportunity to cross-examine Jane Doe IV at the preliminary hearing. *See Crawford*, 541 U.S. at 57-58 (preliminary hearing testimony at which witness had been cross-examined was admissible); *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam) (Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish). A defendant meets his burden of showing a Confrontation Clause violation by showing that the jury might have had a significantly different impression of a witness' credibility had counsel had the opportunity for cross-examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986); *Slovik v. Yates*, 556 F.3d 747, 753 (9th Cir. 2009). The focus of this inquiry "must be on the particular witness, not on the outcome of the entire trial." *Van Arsdall*, 475 U.S. at 680.

Andrade claims the preliminary hearing cross-examination was insufficient because Jane Doe IV's testimony "was significant to support prosecution theories of a distinctive MO," *see* petition at 5-3, and because "the issues at that hearing were sufficiently distinct from those at trial," *see* traverse at 7. However, while the issues at preliminary hearings are usually different from the issues at the trial, the Supreme Court has ruled admissible preliminary hearing testimony where the witness was cross-examined. *See Crawford*, 541 U.S. at 57-58.

Furthermore, Andrade's arguments do not show that the jury might have had a different view of the witness's credibility had counsel been able to cross-examine her at trial.

### III. Support Person for Jane Doe III

Andrade argues his right to confrontation was violated because Jane Doe III was allowed to have a support person accompany her to the witness stand without a hearing to determine if such a person was necessary. The Court of Appeal summarized the relevant facts as follows:

> Prior to trial, the prosecutor, citing section 868.5, subdivision (a), [FN4] moved to allow each victim to be accompanied to the witness stand by a support person. Defense counsel stipulated to the use of such support persons. Accordingly, the trial court granted the motion to allow each of the victims to be accompanied to the witness stand by a support person. It appears, however, that only Jane Doe III was accompanied by a victim witness advocate. Appellant now contends that, despite his lack of objection, his Sixth Amendment right to confront witnesses was violated by the presence of the victim witness advocate during Jane Doe III's testimony because no constitutionally required inquiry on the necessity of support persons occurred. His argument is based primarily on *People v. Adams*, 19 Cal. App. 4th 412, 443–444, (1993), which rejected a constitutional challenge to the support person statute, but held that there must be a case-by-case showing of necessity for a support person presented at an evidentiary hearing.
>
> [FN4] As pertinent here, section 868.5, subdivision (a) provides: (a) "Notwithstanding any other law, a prosecuting witness in a case involving a violation or attempted violation of Section . . . 288a, . . . shall be entitled, for support, to the attendance of up to two persons of his or her own choosing, one of whom may be a witness, at the . . . trial, . . . during the testimony of the prosecuting witness. Only one of those support persons may accompany the witness to the witness stand, although the other may remain in the courtroom during the witness' testimony."

*Andrade*, 238 Cal. App. 4th at 1296.

The California Court of Appeal held the claim was procedurally defaulted because defense counsel had agreed and not objected to the support person for the witness. On the merits, the court denied the claim, holding that the support person had not interfered with defense counsel's ability to cross-examine the witness. *Id.* at 1297-98.

Even if not defaulted, this claim fails because no Supreme Court authority holds there must in all circumstances be a hearing to determine if a witness needs a support person. Andrade

argues *Maryland v. Craig*, 497 U.S. 836, 855-56 (1990) and *Coy v. Iowa*, 487 U.S. 1012, 1021 (1988) require an inquiry into the necessity of a support person. *Craig* addressed a statute to protect child witnesses from the trauma of testifying in child abuse cases by allowing them to testify outside of the courtroom, when the court determines that such a procedure is necessary. *Craig*, 497 U.S. at 855. In *Coy*, two 13-year old victims who alleged the defendant had sexually assaulted them were allowed to testify behind a screen which blocked the defendant from their sight. *Coy*, 487 U.S. at 1014. The Court held the denial of a face-to-face encounter with the defendant's accusers violated his confrontation rights. *Id.* at 1021.

These cases are not relevant to the facts in Andrade's case. Jane Doe III testified in open court, allowing Andrade a face-to-face confrontation with her. Andrade argues his confrontation rights were violated because the support person bolstered Jane Doe III's credibility or demeanor. However, he cites no Supreme Court case that supports such a theory. Therefore, the state court's denial of this claim was not contrary to or an unreasonable application of Supreme Court authority.

## IV. Instructional Errors

Andrade claims the trial court erred in failing to sua sponte give instructions about his out-of-court statements and the defense of consent. He also argues the reasonable doubt instruction was wrong.

### A. Federal Authority

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *Estelle*, 502 U.S. at 71-72. To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the instruction so infected the entire trial that the resulting conviction violates due process, keeping in mind that the category of infractions that violate fundamental fairness is narrowly drawn. *Id.* at 72-73; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). The instruction must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. Where the issue is the failure to give an instruction, the burden on the claimant is heavier because an omitted or

incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred. *Calderon v. Coleman*, 525 U.S. 141, 146 (1998). If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, *see Brecht*, 507 U.S. at 637, before granting relief in habeas proceedings. *Calderon*, 525 U.S. at 146-47.

**B. Instructions Regarding Andrade's Statements**

Andrade argues the trial court had a sua sponte duty to instruct the jury with CALCRIM No. 358 (Evidence of Defendant's Statement) or CALCRIM No. 359 (Corpus Delicti: Independent Evidence of a Charged Crime). The Court of Appeal ruled that the trial court had a sua sponte duty to give these instructions, but found the error to be harmless. *Andrade*, 238 Cal. App. 4th at 1298-99.

CAL CRIM No. 359 states, in relevant part:

> The defendant may not be convicted of any crimes based on his out-of-court statements alone. You may rely on the defendant's out-of-court statements to convict him only if you first conclude that other evidence shows that the charged crime was committed.
> That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.
>
> The identity of the person who committed the crime . . . may be proved by the defendant's statements alone.
>
> You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt.

CAL CRIM No. 358 states, in relevant part:

> You have heard evidence that the defendant made an oral or written statement[s] before the trial. You must decide whether the defendant made any of these statement[s], in whole or in part. If you decide that the defendant made such [a] statement[s], consider the statement[s], along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement[s].

18

[Consider with caution any statement made by the defendant
tending to show his guilt unless the statement was written or
otherwise recorded.]

District courts in California have found that the state court's failure to give these two instructions did not violate due process because they are a matter of state law and because no clearly established Supreme Court authority requires such instructions. *See e.g., Johnson v. Arnold*, 2018 WL 1875630, at *10 (E.D. Cal. Apr. 19, 2018) (CAL CRIM No. 358 is a matter of state law and provides no basis for habeas relief); *White v. Frauenheim*, 2017 WL 3069690, at *12 (E.D. Cal. Jul. 19, 2017) (denying claim because no Supreme Court authority requires giving CAL CRIM Nos. 358 or 359). Without Supreme Court precedent on this issue, the state court's ruling was not contrary to or an unreasonable application of established federal law.

Furthermore, the omission of the instructions did not have a substantial or injurious effect or influence on the jury's verdict. As discussed previously, the evidence of Andrade's guilt was strong. Each of the five victims positively identified Andrade as the rapist from a photo lineup. A gun resembling the gun described by the victims was found underneath the driver's seat of the truck Andrade was driving when he was arrested. Each of Andrade's vehicles matched the descriptions the victims gave of the vehicles used in the rapes. Finally, Andrade's DNA was found in the oral swabs from Jane Doe II and in the condom used to rape Jane Doe V. Furthermore, with the exception of Jane Doe IV, whose preliminary hearing testimony was read, the jury was able to hear and see each victim testify and to judge their credibility.

**C. Instruction on Consent**

Andrade argues he was deprived of the ability to present a defense by the court's failure to sua sponte instruct that he was not guilty of a sex offense if he had a reasonable and good faith belief that the complainant consented.

The Court of Appeal denied this claim under state law which, in the absence of a request for a particular instruction, requires a trial court to instruct on a particular defense only if it appeared the defendant is relying on such a defense and if there is substantial evidence supportive of such a defense which is not inconsistent with the defendant's theory of the case.

*Andrade*, 238 Cal. App. 4th at 1300 (citing *People v. Mayberry*, 15 Cal. 3d 143 (1975) and *People v. Dominguez*, 39 Cal. 4th 1141, 1148 (2006)). The court concluded that Andrade did not meet these requirements because the defense theory of the case was identification rather than consent and, given the detailed evidence that Andrade threatened each victim with a gun and that the victims were terrified during the assaults, substantial evidence did not support the theory of consent. *Id.* at 1302-03.

In a case on direct appeal, the Supreme Court has held, "As a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988). Assuming *Mathews* applies to this habeas case, Andrade's right to a defense instruction is limited to those cases where sufficient evidence exists for a reasonable jury to find in his favor. The Court of Appeal's finding of insufficient evidence to support an instruction on consent is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1) unless Andrade rebuts it by clear and convincing evidence. As discussed above, there was strong evidence that Andrade used force when he sexually assaulted each victim, negating consent. Andrade argues the evidence of negotiations over money for the sex act and the use of condoms shows consent. However, in the two instances where the victims mentioned money, Andrade immediately pulled out a gun and pointed it at them. That he used a condom is not determinative of consent because he could have used it to protect himself or to prevent leaving his DNA evidence with the victims. Andrade's proffer of evidence does not meet the standard necessary to rebut the strong evidence showing he raped his victims by intimidation.

### D. Instructions on Reasonable Doubt

The relevant instructions are as follows, in pertinent part:

> CALCRIM No. 220
>
> Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. . . . In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proved

the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

CALCRIM No. 222

You must decide what the facts are in this case. You must use only the evidence that was presented in this courtroom. Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence.

Andrade argues these two instructions denied him due process because: (1) they told the jurors they had to decide the facts based on the evidence presented in court, but reasonable doubt may be based on the absence of evidence, and (2) the "abiding conviction" language conveys an insufficient standard of proof in that it describes the "jurors' duration of belief in guilt, not their degree of certainty."

Federal cases have addressed Andrade's arguments and rejected them. In *Victor v. Nebraska*, 511 U.S. 1, 15-16 (1994), the Supreme court noted the jury was correctly instructed that it could only consider the evidence presented at trial. *See also Leavitt v. Arave*, 383 F.3d 809, 818 (9th Cir. 2004) (reasonable doubt instruction correctly "stressed importance of finding every element beyond a reasonable doubt based solely on the evidence presented at trial"); *Sims v. Small*, 2012 WL 1038743, at *7 (N.D. Cal. Mar. 27, 2012) (denying identical challenge to same jury instructions); *Tafolla v. Jaquez*, 2012 WL 5411716. *5-6 (N.D. Cal. Nov 6, 2012) (same). Furthermore, the phrase in CAL CRIM No. 220, "unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to acquittal," means the jury may find a defendant not guilty if, through the lack of evidence, the government has failed to prove the charges beyond a reasonable doubt. *See People v. Flores*, 153 Cal. App. 4th 1088, 1092-93 (2007).

Federal authority also holds the "abiding conviction" language of CAL CRIM 220 correctly instructs the jury on reasonable doubt. In *Victor*, 511 U.S. at 14-15, the Court stated, "An instruction cast in terms of an abiding conviction as to guilt, without reference to a moral certainty, correctly states the government's burden of proof." The Court explained the word "abiding" means "settled and fixed, a conviction which may follow a careful examination and

comparison of the whole evidence." *Id.*; *see also Lisenbee v. Henry*, 166 F.3d 997, 999-1000 (9th Cir. 1999) (explaining in depth why "abiding conviction" language correctly defines reasonable doubt).

In summary, the Court of Appeal's denial of all the claims based on jury instructions was not contrary to or an unreasonable application of Supreme Court authority.

## V. Sentencing Claims

Andrade argues the trial court misapplied California Penal Code sections 667.61(e)(5) and 654 by sentencing him to more than five 15-to-life terms. However, habeas relief does not encompass errors of state law. *See Estelle*, 502 U.S. at 67 ("federal habeas corpus relief does not lie for errors of state law . . . in conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States"). Therefore, any claim based upon the misapplication of state law is denied for lack of habeas jurisdiction. Likewise, any federal due process claim based on the misapplication of state law is denied. *See Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (petitioner may not transform state-law issue into a federal claim by merely asserting a violation of due process).

Andrade also argues his 195-years to life sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment since he is a 42-year old man without prior convictions and testing has shown he is in the low risk category for sexual re-offending.

The Eighth Amendment contains a "narrow" proportionality principle. *Graham v. Florida*, 560 U.S. 48, 59-60 (2010). This principle "does not require strict proportionality between crime and sentence but rather forbids only extreme sentences that are grossly disproportionate to the crime." *Id.*; *see Solem v. Helm*, 463 U.S. 277, 303 (1983). For the purposes of review under 28 U.S.C. § 2254(d)(1), it is clearly established that "[a] gross proportionality principle is applicable to sentences for terms of years." *Lockyer v. Andrade*, 538 U.S. 63, 72 (2003); *Gonzalez v. Duncan*, 551 F.3d 875, 882 (9th Cir. 2008) ("The Supreme Court's Eighth Amendment jurisprudence establishes that no penalty is *per se* constitutional, and that *successful* challenges to the proportionality of particular sentences are exceedingly rare and

reserved only for the extraordinary case.") (emphasis in original). Substantial deference is granted to legislatures' determination of the types and limits of punishments for crimes. *United States v. Gomez*, 472 F.3d 671, 673-74 (9th Cir. 2006). To determine if the sentence is grossly disproportionate, the court compares the harshness of the penalty with the gravity of the offense. *Norris w. Morgan*, 622 F.3d 1276, 1291-96 (9th Cir. 2010) (the gravity of the offense requires consideration of whether the crime involved use of force, degree of force used, whether weapons were used, and whether the crime threatened to cause grave harm to society).

Although Andrade's sentence was harsh, it was not cruel and unusual under established federal authority. Although he was relatively young and had no prior record, he brutally victimized five young women, two of whom were minors. He drove all the victims to isolated locations where they were particularly vulnerable and used physical violence and a gun to terrorize them and force them to succumb to his sexual demands. Several of them cried while attempting to do as he commanded, not knowing whether they would be allowed to leave alive. And he forced them to perform repeated sexual acts before releasing them. Given the number of Andrade's crimes and victims, the sexual nature of those crimes and the violence he used to intimidate and terrorize his victims, his sentence was not grossly disproportionate to his offenses.

## VI. Cumulative Error

Andrade argues the cumulative prejudice from the alleged constitutional violations establishes that he did not receive a fair trial.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003). Cumulative error is more likely to be found prejudicial when the government's case is weak. *Thomas v. Hubbard*, 273 F.3d 1164, 1180 (9th Cir. 2002), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815, 829 n.11 (9th Cir. 2002).

As discussed above, the prosecutor's case against Andrade was strong. Furthermore, because no single constitutional error occurred, no cumulative error is possible. *See Hayes v.*

*Ayers*, 632 F.3d 500, 524 (9th Cir. 2011).

## CONCLUSION

Andrade's petition for a writ of habeas corpus is denied. A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The Clerk shall enter judgment in favor of the respondent and close the file.

**IT IS SO ORDERED.**

Dated: August 1, 2019

VINCE CHHABRIA
United States District Judge